UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 3:21-cr-16-MMH-JBT

JEFFREY ALAN SIEGMEISTER

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, JEFFREY ALAN SIEGMEISTER, and the attorney for the defendant, Waffa Hanania, Esq., mutually agree as follows:

### A.    Particularized Terms

1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One, Two, Seven, and Ten. Count One charges the defendant with conspiracy to use a facility of commerce for unlawful activity, in violation of 18 U.S.C. §§ 371 and 1952(a)(3). Count Two charges the defendant with conspiracy to interfere with commerce by extortion, in violation of 18 U.S.C. § 1951(a). Count Seven charges the defendant with wire fraud, in violation of 18 U.S.C. § 1343. Count Ten charges the defendant with filing a false tax return, in violation of 26 U.S.C. § 7206(1).

Defendant's Initials ____                          AF Approval _MT_

2. <u>Maximum Penalties</u>

Count One carries a maximum sentence of five years' imprisonment, a fine of up to $250,000, or both imprisonment and a fine, a term of supervised release of not more than three years, and a special assessment of $100. A violation of supervised release carries an additional term of not more than two years' imprisonment, and an additional term of supervised release may be imposed.

Count Two carries a maximum sentence of 20 years' imprisonment, a fine of up to $250,000, or both imprisonment and a fine, a term of supervised release of not more than three years, and a special assessment of $100. A violation of supervised release carries an additional term of not more than two years' imprisonment, and an additional term of supervised release may be imposed.

Count Seven carries a maximum sentence of 20 years' imprisonment, a fine of up to $250,000, or both imprisonment and a fine; a term of supervised release of not more than three years; and a special assessment of $100. A violation of supervised release carries an additional term of not more than two years' imprisonment, and an additional term of supervised release may be imposed.

Count Ten carries a maximum penalty of three years' imprisonment, a fine of up to $250,000, or both imprisonment and fine; a term of supervised release of not more than one year; and a special assessment of $100. A violation of supervised release carries an additional term of not more than one year of imprisonment, and an additional term of supervised release may be imposed.

Defendant's Initials _____

2

The cumulative maximum penalty is a term of imprisonment of not more than 48 years, a fine of not more than $1,000,000, or both imprisonment and a fine, a term of supervised release of not more than three years; and a mandatory special assessment of $400. A violation of the terms and conditions of supervised release carries a sentence of a term of imprisonment of not more than seven years, and an additional term of supervised release may be imposed.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.    Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:    Two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

Second:    The Defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:    During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Indictment; and

Fourth:    The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

3

Defendant's Initials 

The elements of Count Two are:

First:        Two or more persons agreed to commit extortion encompassed within the Hobbs Act, that is, to cause an individual to part with property through the wrongful use of fear of economic harm and under color of official right, which delayed, interrupted, or affected interstate commerce;

Second:     The Defendant knew of the conspiratorial goal; and

Third:      The Defendant voluntarily, willfully, and knowingly participated in helping to accomplish the goal.

The elements of Count Seven are:

First:        The Defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second:     The false pretenses, representations, or promises were about a material fact;

Third:      The Defendant acted with the intent to defraud; and

Fourth:    The Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

The elements of Count Ten are:

First:        The Defendant made or caused to be made an IRS Form 1040 for the tax year alleged in Count Ten of the Indictment;

Second:     The IRS Form 1040 contained a written declaration that it was made under the penalty of perjury;

Third:      When the Defendant made or helped to make the IRS Form 1040, he knew it contained false material information;

Fourth:    When the Defendant did so, he intended to do something he knew violated the law; and

4

Defendant's Initials 

Fifth:    The false matter in the IRS Form 1040 related to a material statement.

4.    Counts Dismissed

At the time of sentencing, the remaining counts against the defendant, Counts Three, Five, Six, Eight, Nine, Eleven, and Twelve of the Indictment, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.    Mandatory Restitution to Victim of Offenses of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b) and § 3663, defendant agrees to make full restitution to any victim(s) of the offenses. The amount of restitution due and owing, if any, will be determined by the Court at the time of sentencing.

6.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph

5

Defendant's Initials 

B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      7.     <u>Cooperation - Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the

Defendant's Initials _____

cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.  Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

9.  Cooperation - Responsibilities of Parties

a.  The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that

Defendant's Initials _____

the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b. It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1) The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2) The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of

8

Defendant's Initials _____

such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)　The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)　The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)　The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

Defendant's Initials _____

10.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant, or defendant's nominees.

The assets to be forfeited specifically include, but are not limited to, the following: the sum of $518,803.50 in proceeds the defendant admits he obtained, as the result of the commission of the offenses charged in Counts One and Two and Seven, to which the defendant is pleading guilty, as well as, 7,372 shares of The Coca-Cola Company common stock held by Computershare Shareholder Services, Inc., Account #C0006753353, held in the names of Nancy A. Bowen & William G Bowen Joint Tenants, which assets are proceeds of the wire fraud offenses to which the defendant is pleading guilty. The net proceeds from the forfeiture and sale of any specific asset(s), with the exception of Coca-Cola Company common stock, will be credited to and reduce the amount the United States shall be entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

The defendant acknowledges and agrees that (1) the defendant obtained $518,803.50 as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds not recovered by the United States through the forfeiture of the directly traceable assets listed herein have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the

10

Defendant's Initials _____

United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense(s) of conviction and, further, the defendant consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense(s) and consents to the entry of the forfeiture order into the Treasury Offset Program.

The defendant additionally agrees that because the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence and the United States shall not be limited to the forfeiture of the substitute assets, if any, specifically listed in this plea agreement.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, judicial, or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the

Defendant's Initials _____

11

forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will

Defendant's Initials _____

not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

13

Defendant's Initials 

**B.**     **Standard Terms and Conditions**

     1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of any of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

     2.    Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from

14

Defendant's Initials 

imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

      3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

      4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

      5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly,

15

Defendant's Initials 

including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the

16

Defendant's Initials _____

attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.   <u>Defendant's Waiver of Right to Appeal the Sentence</u>

      The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

Defendant's Initials 

8. Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right

Defendant's Initials _____

to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

     11.   Factual Basis

        Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials ___

12. Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, or agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _15th_ day of _February_, 2022.

ROGER B. HANDBERG
United States Attorney

JEFFREY ALAN SIEGMEISTER
Defendant

KELLY S. KARASE
Assistant United States Attorney

WAFFA HANANIA, ESQ.
Attorney for Defendant

DAVID B. MESROBIAN
Assistant United States Attorney

FRANK TALBOT
Assistant United States Attorney
Chief, Jacksonville Division

20



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:21-cr-16-MMH-JBT

JEFFREY ALAN SIEGMEISTER

PERSONALIZATION OF ELEMENTS

COUNT ONE:

First:       From at least November 2017 through May 16, 2019, did you
             agree with Marion Michael O'Steen to try to accomplish a shared
             and unlawful plan to engage in the unlawful activity of bribery and
             extortion in violation of the laws of the State of Florida, using a
             facility in interstate commerce, that is a cellular telephone?

Second:      Did you know the unlawful purpose of the plan and willfully join
             in it?

Third:       During the conspiracy, did you knowingly engage in at least one
             overt act as described in the Indictment, to include sending
             Marion Michael O'Steen a text message using a cellular
             telephone with four photographs of your bulls on April 16, 2018,
             with the intent to solicit a bribe for yourself after the favorable
             resolution of the case of Client A, and sending O'Steen text
             messages on August 21, 2018, advising that Siegmeister was
             waiting for O'Steen to receive the extorted funds, referred to as
             "Mr. Green," before preparing the Deferred Prosecution
             Agreement for Client B?

Fourth:      Do you admit that the overt acts described above were committed
             at or about the times alleged and with the purpose of carrying out
             or accomplishing some object of the conspiracy?

Defendant's Initials 

COUNT TWO:

First:    From at least August 9, 2018, through May 16, 2019, did you knowingly and willfully agree with others, including Marion Michael O'Steen, to commit extortion encompassed within the Hobbs Act, that is, to cause an individual, identified as Client B, to part with property, that is money Client B told O'Steen he had obtained in California, through the wrongful use of fear of economic harm and under color of official right?

Second:    Do you admit that you knew of the conspiratorial goal?

Third:    During the conspiracy, did you voluntarily, willfully, and knowingly participate in helping to accomplish the goal?

COUNT SEVEN:

First:    Did you knowingly devise or participate in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises?

Second:    Were the false pretenses, representations, or promises about a material fact, specifically your over-reporting of expenditures incurred by the estate of L.T.?

Third:    Did you act with the intent to defraud?

Fourth:    On or about February 25, 2016, did you transmit or cause to be transmitted by wire some communication, that is through the deposit of a check in the amount of $313,816.52, from a Computershare, Inc. account to your First Federal Bank Account held by The Siegmeister Law Firm PA, in interstate commerce to help carry out the scheme to defraud the Circuit Court for Columbia County, Florida, and the estate of L.T.?

COUNT TEN:

First:    On or about April 17, 2016, did you make or cause to be made an IRS Form 1040 for tax year 2015 as alleged in Count Ten of the Indictment?

Second:    Did the IRS Form 1040 contain a written declaration that it was

22

Defendant's Initials

made under the penalty of perjury?

Third: When you made or helped to make the IRS Form 1040, did you know it contained false material information, that is that your total income was $150,313?

Fourth: When you did so, did you intend to do something you knew violated the law?

Fifth: Do you admit that the false matter in the IRS Form 1040, that is your total income, related to a material statement?

23

Defendant's Initials 

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:21-cr-16-MMH-JBT

JEFFREY ALAN SIEGMEISTER

## FACTUAL BASIS

Jeffrey Alan Siegmeister was elected as the State Attorney for the Third Judicial Circuit of Florida in 2012, taking office in 2013. The Third Judicial Circuit encompasses, among others, Columbia, Hamilton, and Suwannee Counties, which are in the Middle District of Florida. Siegmeister was reelected as State Attorney in 2016, having run unopposed, and led the State Attorney's Office for the Third Judicial Circuit of Florida (the "State Attorney's Office") as the State Attorney from 2013 until his resignation on December 17, 2019. In this position, Siegmeister had the authority to perform official acts on behalf of the State Attorney's Office, including bringing, reducing, and dismissing criminal charges.

In June 2017, Marion Michael O'Steen represented an individual, specified as "Client A" in the Indictment, who was charged by Siegmeister's office with attempted first-degree murder, arson, possession of a firebomb, and violation of domestic violence injunction after throwing multiple Molotov cocktails at 3:00 a.m. through the window of the bedroom of her estranged husband. On or about November 8, 2017, O'Steen sent a text message to Siegmeister seeking leniency for O'Steen's client, Client

Defendant's Initials _____                24

A, claiming that the victim did not want to seek prison time for Client A.

The next day, Siegmeister replied with a text message to O'Steen that said, "When Are you and [V.] and [S.] and [M.] and everybody else going to buy one of my registered bulls?" The next month, O'Steen forwarded an email to Siegmeister from the Siegmeister's subordinate Assistant State Attorney, complaining about the Assistant State Attorney's offer to a five-year prison plea deal for Client A. Siegmeister responded that he would deal with it. Siegmeister required his subordinate Assistant State Attorney to seek a continuance of the case. In the afternoon April 16, 2018, Siegmeister and O'Steen appeared in court in Columbia County and presented a plea agreement in which Client A tendered a no contest plea and the parties jointly recommended she receive a 13-month prison sentence. Siegmeister represented to the court that the victim was in agreement with the sentence. Approximately two hours following the hearing, Siegmeister sent O'Steen four photographs via text message using his cellular telephone, depicting his bulls for sale, indicating he expected O'Steen to purchase a bull from him in exchange for the favorable treatment Siegmeister had provided O'Steen's client, Client A. Siegmeister and O'Steen spoke on the phone several times the next day.

In August 2018, an individual, specified as "Client B" in the Indictment, advised agents with the Federal Bureau of Investigation ("FBI") that, in February 2018, he, his brother, and another individual had been arrested in Lake City, Florida, in Columbia County, on charges of operating an illegal gambling enterprise. Client B stated that he had retained O'Steen to represent him in that case, and had given him a

25

Defendant's Initials ⟨initials⟩

$15,000 retainer. Client B stated that O'Steen informed him that Siegmeister would drop the charges against Client B and his two co-defendants in exchange for a $50,000 payment. Client B stated that he had told O'Steen that he could come up with $30,000. Client B subsequently provided the FBI with an email dated August 14, 2018, from O'Steen's paralegal, C.L., in which she wrote: "[O'Steen] wanted me to follow up to advise he has set up a meeting with Jeff [Siegmeister], the State's Attorney for this Friday. If you are wanting a different result about this issue to go the other way you & Michael discussed then he needs to know you are serious about what it takes to do so before he goes to that meeting."

As Siegmeister stated in a post-indictment proffer with the United States, around this time, O'Steen stopped by Siegmeister's office to discuss Client B's case. Siegmeister told O'Steen that Client B would have to take a felony plea and receive probation. However, Siegmeister made it clear to O'Steen that if O'Steen wanted Client B to get a pre-trial diversion agreement, O'Steen would have to buy one of Siegmeister's bulls. O'Steen accepted the arrangement and agreed to pay the bribe for the favorable disposition of Client B's case.

On August 16, 2018, Client B made a recorded phone call to O'Steen, in which Client B told O'Steen he was in Dallas, Texas. O'Steen asked if Client B could "come up with the entire $30,000 by next week." O'Steen also asked if Client B would be in Lake City the next day, so that O'Steen could meet with Client B "before I see Jeff [Siegmeister] so we can make, I want, I want ah look at you so we're very clear on

Defendant's Initials _____

what I'm gonna go propose." Also on August 16, Siegmeister texted O'Steen: "We still on for tomorrow? If yes, meet me at [a restaurant in Suwannee County] at 11:30 or so. After lunch I'll drive you out to my farm and show you my bulls and cows. I'll take you back to your vehicle when we're done." Siegmeister and O'Steen subsequently arranged via text to meet after lunch.

On August 17, 2018, Client B met with O'Steen in person in Lake City. Client B acknowledged that he had just gotten back into town via a flight through Dallas. O'Steen was accompanied by an assistant. The meeting was audio-recorded. During the meeting, Client B advised that he is going to sell his house in Lake City, and O'Steen advised, "Look, what I'm going to try to fix is an agreement with the state and tell them you are moving to California where you have to call in." O'Steen proposed that Client B pay $30,000 in exchange for the charges being dropped against the two other individuals, and that Client B sign a deferred prosecution agreement. O'Steen stated that the agreement was necessary because Siegmeister had a "problem" with Client B, and he needed a way to ensure Client B did not continue his business. Client B asked whether the case could go away completely. O'Steen said, "So you're saying, for example, if I gave you a number of $60,000, and I make yours go away completely, and you're out of here, handle that without any agreement? You're after a number. I don't know if it'll fly or not." Client B again asked what it would take. O'Steen said he was going that same day to meet with Siegmeister. O'Steen said, "I'm not going to pay him off, and I don't want you [Client B] to think that." O'Steen further said, "I'm not going to bribe him. I'm going to go explain to him I've got to eat around

Defendant's Initials _____

here." O'Steen clarified, "So you're saying you can probably come up with more than thirty [thousand] if I can make yours go away without an agreement, is that what you are telling me?" Client B stated again he wanted the whole case over. O'Steen stated, "You want a bribe to make it go away?" O'Steen's assistant interjected that Client B "wants to feel out and see what [Client B] can do in the terms of making every…" O'Steen interrupted and stated, "Let me go over there and talk to him and get a good feel." O'Steen clarified, "Either way you got the thirty [thousand] to do the first deal if that is what we got to do?" Client B acknowledged that he obtained the money in California and that was why he had traveled to California.

O'Steen and Siegmeister met in the afternoon on August 17, 2018, and traveled together to Siegmeister's farm in Suwanee County, where Siegmeister and his wife lived and raised bulls. After the meeting, Client B and O'Steen spoke on a consensually monitored phone call. Client B asked if O'Steen had met with Siegmeister. O'Steen stated, "I can make everything go away all, your brothers, the other two *nolle pros* with you sign an agreement to pay their cost of investigation, you leave, you will not have to report but one time, uh, ah, I need, I need $75,000 and everything goes away and you pay the money. Ah you got to sign this agreement and agree to forfeit what they seized at the jail, they get to keep that. That's the deal. And we got to do this by Tuesday at 5 o'clock to get this done." Client B stated he would not be able to come up with that much money by Tuesday. O'Steen stated, "That's where we are at. You asked me what the number was to get a clean slate. I just told you." Client B asked, "And the State Attorney agreed with it?" O'Steen replied, "I'm telling you, get me

Defendant's Initials ___

$75,000 then you will owe the cost of the, what was originally in that probation agreement, but you won't be on probation." Client B stated, "I bring, I bring it to your office maybe $20,000 do you want to receive a check, cash, or?" O'Steen replied, "I need 75 to make all your stuff go away and I would prefer cash, but however you want to do it." Siegmeister knew that Client B's co-defendants were located in California as O'Steen had previously sent a text message to Siegmeister on July 6, 2018, in reference to Client B's co-defendants, that said, "The Vietnamese are going to make arrangements to fly from California for what ever date change of plea is set for."

Later, on August 17, 2018, Client B and O'Steen spoke during additional consensually monitored phone calls. Client B questioned why the amount of the payment increased, and asked if O'Steen had met with Siegmeister. O'Steen stated that he had. When Client B asked how much money Siegmeister wanted, O'Steen stated, "Listen, listen, this is nothing to do with the State Attorney, it's a favor that I'm burning that somebody else be willing to pay for it. It's not a bribe at all, so it ain't like you're thinking. I gave you a number, you asked me for a number this morning, I gave it to you." In a subsequent call, O'Steen stated that he was not going to bribe Siegmeister, but told Client B, "You're paying me to use the people that I know to make it you won't have to go to court, the lowest I'm going to get the results is $60,000. The 15 you give me [*i.e.*, in addition to the $15,000 retainer paid initially], and that's $25,000 per person to make the charges go away. That's as good as I'm gonna do, that's as good as it's gonna get, and that's not a payoff." O'Steen told Client B that he had favors with Siegmeister which people would pay him for, and that he was not

Defendant's Initials _____

going to "burn them up" without getting paid for them. O'Steen said he would not accept less for the use of this "favor," and stated that if Client B did not pay him the $60,000 for this deal, "I can probably get the other two dismissed but you're going to have to do probation otherwise. Or you can go to trial and fight 'em out, but I don't think you can win." O'Steen again stated, "I'm not burning up a favor that I can get somebody to pay for, good money to make their cases go away. I'm not gonna burn that favor up." O'Steen denied that he was trying to "extort" Client B, and said that Client B could go to another attorney "but you're not going to get the results." O'Steen again affirmed that the price for the "favor" was $60,000, and they had to get it done by the next week, stating, "[Siegmeister] is helping me. . . . If you want to walk out of court and get these charges dismissed, that's what it's going to take. Period. For all three. Text me Monday."

On August 20, 2018, Client B and O'Steen met at an office in Trenton, Florida. The meeting was audio-recorded. O'Steen told Client B that there were two options. The first option was that Client B could decline to pay O'Steen anything additional, and he and his co-defendants would have to do five years of probation and have criminal records. The second option was that Client B could pay O'Steen $60,000, and the charges would be dropped pursuant to a deferred prosecution or pretrial intervention ("PTI") agreement. O'Steen demanded that Client B provide the $60,000 by August 26, 2018, to have the charges dropped.

On August 21, 2018, Siegmeister messaged O'Steen, "Got your email. Are we on for resolution?" O'Steen replied, "Send me deferred pros agreement please."

Defendant's Initials 

Siegmeister responded, "I haven't done it yet. You told me you were waiting on your client and Mr Green. I will do it if we have a deal. I'll call judge Johnson and advise it's been sent to pti if we have an agreement. It will probably be tomorrow before I can send it." O'Steen responded, "Ok. I'll call you mid morning tomorrow." Siegmeister responded, "Does that mean you have your money?" O'Steen replied, "Should have tomorrow."

On August 23, 2018, Client B and O'Steen met at a car dealership in Lake City. The meeting was video- and audio-recorded. During the meeting, Client B provided O'Steen with $30,000 in cash as an initial payment toward the $60,000.

On August 27, 2018, O'Steen sent a text message to Siegmeister, asking "When will I have pti agreement on [Client B]? He is ready to leave for cali." Siegmeister responded, "I'll have it tomorrow. Sorry thought he went back already." O'Steen then texted Siegmeister, "Looking at picking up bull September 12." Siegmeister replied, "10-4. Let me know when and I'll have him penned and me or wife ready to meet someone. If you want I may be able to bring him and then can go hang out with [D.] and [H.] etc. let me know."

On September 4, 2018, Client B delivered another $30,000 cash to O'Steen at his law office in Dixie County, Florida. Later that day, Siegmeister texted O'Steen, "You still on for next Wednesday [September 12, 2018]? Should've charged you triple based on your windfall lol." Siegmeister then texted, "Hey, my wife works for rep [h.] in the panhandle and has been tasked with raising 2500 for the local Republican Party so they can get matching funds. Want to help me raise it so I don't have to do some

Defendant's Initials _____

event. I was going to ask [V.] as well. I didn't think it was that much. Let me know. Call me." A few hours later, after O'Steen did not respond, Siegmeister sent him a text message stating, "So. You get what you want and make a mint and I'm persona non grada [sic]." On September 7, 2018, Siegmeister texted O'Steen, "FYI, the fundraising deadline is the 20th, not end of month." O'Steen replied, "X4. I'll see you Wednesday [September 12]."

On September 12, 2018, FBI surveillance observed O'Steen travel with his father, K.O., to Siegmeister's farm. K.O. owned a cattle ranch, while O'Steen had no experience or involvement in raising livestock. K.O. provided Siegmeister with a check for $4,000 in exchange for one of Siegmeister's bulls. Rather than taking the bull to K.O.'s ranch, O'Steen and K.O. took the bull directly to H.S.'s farm in Dixie County, where O'Steen left it for storage and expressed to H.S. that he wanted to sell the bull. Later that day, K.O. deposited $4,000 cash into his bank account. O'Steen subsequently sold the bull to M.T. for $3,500, which M.T. paid directly to O'Steen in cash.

In or around January 2019, O'Steen was retained to represent Client C, who had been charged by the State Attorney's Office with battery and trespass. A video recording of the incident captured Client C's battery of an older male on the older male's property. After a phone call with O'Steen and O'Steen's message to Siegmeister in which O'Steen informed Siegmeister that O'Steen was meeting with [D.A.] and [H.S.] tomorrow, Siegmeister responded, to tell [D.A.] and [H.S.] hi, and "Tell them they're welcome for the PTI on the guy who beat some old man on video. It's already

Defendant's Initials ____

been approved. They shouldn't have any complaints." Siegmeister resolved the case against Client C with a pre-trial intervention agreement, entered in July 2019, despite a subordinate Assistant State Attorney advising Siegmeister that the victims of the battery and trespass did not want Client C to get PTI. Nonetheless, Siegmeister texted O'Steen on March 11, 2019, "The PTI is approved." One minute later, Siegmeister texted O'Steen, "FYI I'm raising money and getting petitions again. Call me or text me when is a good time to come down and catch up with you and the crew," soliciting O'Steen for campaign contributions and assistance with his re-election in exchange for the PTI Siegmeister had approved for O'Steen's client, Client C.

Seeking more capital for the PTI given to Client C, Siegmeister sent O'Steen another message on March 13, 2019, stating, "Let me know if you're serious about my bull," and another message on March 22, 2019, "By the way, that PTI is causing serious heartburn. That mans wife is yelling, screaming, calling the press, the AG etc. And no, I'm not revoking offer of PTI for [D.A.]'s sister's boyfriend [Client C]. Just FYI."

On May 8, 2019, agents with the FBI and the Internal Revenue Service – Criminal Investigations approached Siegmeister to serve a federal search warrant for his cellular phone. The agents conducted a recorded consensual interview of Siegmeister for approximately three hours. During the interview, Siegmeister acknowledged that O'Steen had helped Siegmeister get elected as State Attorney, and that O'Steen knew many of the politically powerful people in the Third Circuit. With respect to Client B's case, Siegmeister stated that he knew O'Steen was getting $60,000

Defendant's Initials _____

to secure a PTI for Client B, which Siegmeister acknowledged was more than O'Steen deserved. After the agents showed Siegmeister the August 21, 2018 text message where Siegmeister referenced O'Steen waiting on "Mr. Green," Siegmeister admitted that "Mr. Green" referred to the additional money from Client B. Siegmeister admitted that O'Steen had asked Siegmeister to delay resolving the case so O'Steen could obtain the additional $60,000, and that Siegmeister had agreed to hold off on signing the PTI until O'Steen got paid.

After the agents showed Siegmeister his September 4, 2018 text message where he referred to charging O'Steen "triple" based on O'Steen's "windfall," Siegmeister acknowledged that this was a reference to O'Steen getting paid $60,000 "for basically negotiating a case." The agents and Siegmeister also discussed how the reference to charging O'Steen "triple" referred to the sale of the bull on September 12, 2018. Siegmeister acknowledged that the bull business, which was in his wife's name, was really Siegmeister's business, which he characterized as an "expensive hobby." Law enforcement subsequently learned that the advertised price for Siegmeister's bulls was $2,500, and that neither he nor his wife had ever previously sold a bull for $4,000 or even requested $4,000 as a price.

Through the course of the bribery investigation, agents reviewed financial records, which led them to discover that from 2010 through 2015, Siegmeister had served as the voluntary guardian for L.T., an elderly man who was incapacitated and in need of assistance handling his financial affairs. Evidence developed through the course of the investigation revealed that Siegmeister engaged in a scheme to defraud

Defendant's Initials _____

L.T.'s Estate by diverting money and Coca-Cola stock to himself. Approximately five weeks after his appointment by the probate court as voluntary guardian, a last will and testament was drafted for L.T., which named Siegmeister's mother, N.B., as the 100% sole beneficiary of L.T.'s estate, which, as Siegmeister reported in his petition to be appointed as voluntary guardian for L.T., had assets in excess of $660,000 at the time, the largest asset being shares of Coca- Cola stock. Part of Siegmeister's duties and responsibilities as the guardian was to file annual accounting reports with the probate court, disclosing itemized expenditures and the current asset inventory for L.T. Siegmeister also took possession of L.T.'s assets and established a bank account at First Federal Bank, account XXXXX2860, in the name of L.T., Jeffrey A. Siegmeister as Guardian (the "Guardianship Account"), which held assets of L.T.

L.T. died on January 14, 2015. On the same day, Siegmeister deposited a check in the amount of $40,458.20 into the Guardianship Account, which was proceeds from Siegmeister's liquidation of a portion of L.T.'s Coca-Cola shares. Siegmeister immediately withdrew $2,000 in cash from the account.

Siegmeister wrote a check (#2068) from the Guardianship Account funded by L.T.'s assets payable to himself for $18,428.20. In the memo section of the check was written "medical reimbursement." Siegmeister deposited the check on January 15, 2015, into Columbia Bank account # XXXX8160 held in the name of Jeffrey A. Siegmeister and J.L.S. Siegmeister opened the account on June 29, 2006, and had signature authority over it. Siegmeister used this money for his personal benefit, rather than to pay medical expenses incurred by L.T.

Defendant's Initials 

Siegmeister wrote a check (#2069) from the Guardianship Account funded by L.T.'s assets payable to himself for $20,000. In the memo section of the check was written "hospital/medical settlement." Siegmeister deposited the check on January 21, 2015, into Columbia Bank account # XXXX8160 held in the name of Jeffrey A. Siegmeister and J.L.S. Siegmeister used this money for his personal benefit rather than to pay L.T.'s hospital/medical expenses.

On February 2, 2015, Siegmeister deposited a check in the amount of $190,460, into the Guardianship Account that was additional proceeds from Siegmeister's liquidation of L.T.'s Coca-Cola shares. Approximately two months later, Siegmeister withdrew the balance of $200,833.94 and deposited it in his law firm trust account at First Federal Bank, account XXXXX4706. From there, he transferred funds via checks to his personal bank accounts he held at Columbia Bank (account XXXX8160) and First Federal Bank (account XXXXX3579), that he held jointly with J.L.S., to pay personal expenses and used $45,000 for a down payment for his purchase of real property in Live Oak, Florida, that he later used as his primary residence. Siegmeister also used $46,000 of this money as the final payment for the purchase of real property in Branford, Florida, that he used as rental property.

From January 14, 2015 through December 31, 2015, Siegmeister diverted at least $240,000 in L.T.'s assets to himself for his own personal use and enjoyment while serving as L.T.'s Court-appointed voluntary guardian.

On or about September 1, 2015, Siegmeister signed annual accountings and a final accounting for the L.T. guardianship. In the final accounting, Siegmeister signed

36

Defendant's Initials 

under penalties of perjury that he had read the accounting and that it accurately represented a full and correct account of L.T.'s property, transactions and disbursements by Siegmeister. Siegmeister omitted the $18,428.20 and $20,000 he wrote to himself from the Guardianship Account in the final accounting filed with the Court. Further, Siegmeister over-reported expenditures by at least $53,148. For examples:

a)  Siegmeister falsely listed a purported $38,620 expenditure to Lake City Medical Center with a date of July 2, 2014, when Lake City Medical Center records show that this expenditure never occurred. The Guardianship Account did not have a corresponding debit for $38,620;

b)  Siegmeister falsely listed a purported $10,264.22 expenditure to Lake City Medical Center with a date of September 11, 2014, when Lake City Medical Center records show that the actual payment it received was for $264.22. The Guardianship Account records corroborate Lake City Medical Center records with a $264.22 check (#2059) payable to the hospital on September 11, 2014;

c)  Siegmeister falsely listed a purported $2,528.05 expenditure to Harper Emergency Physicians with a date of October 10, 2014, when records of Harper Emergency Physicians show that $1,000 was received on October 14, 2014. The Guardianship Account records corroborate Harper Emergency Physicians' records, with a $1,000 check (#2060) payable to Harper Emergency Physicians; and

d)  Siegmeister falsely listed a purported $3,734 expenditure to Harpers Emergency Phys with a date December 18, 2014, when records of Harper's Emergency Physicians show that $734 was received on December 26, 2014. The Guardianship Account records corroborated Harper's Emergency Physicians' records, with a $734 check (#2071) payable to Harper's Emergency Physicians on December 18, 2014.

On or about October 19, 2015, Siegmeister signed a petition under penalty of perjury for administration of L.T.'s estate, which was filed with the probate court, and

Defendant's Initials 

37

which listed the assets and approximately value of L.T.'s estate in an attachment. The attachment did not list the assets Siegmeister had previously diverted for his personal use and over-inflated debts of the estate to conceal his misappropriation of L.T.'s assets. This included inflating expenditures at healthcare facilities by approximately $90,000, identifying "cash on hand" under the "assets" section to be $96,590.46, when the balance of funds in Siegmeister's trust account where he had previously transferred the entirety of the Guardianship Account was actually $1,654.22.

On February 25, 2016, Siegmeister deposited a check in the amount of $313,816.52 into his law firm trust account at First Federal Bank, which check represented the proceeds of a sale of L.T.'s Coca-Cola stock, which was made by Siegmeister as the Personal Representative for L.T.'s Estate. In 2016, First Federal Bank had a direct relationship with the Federal Reserve Bank to negotiate deposited checks. The Federal Reserve Bank received interstate electronic wire transmissions from First Federal Bank in Florida to their processing center in Dallas, Texas.

On March 7, 2016, Siegmeister deposited a check in the amount of $264,500, payable to N.B. or "Jeffrey Siegmeister," from his law firm trust account, into his jointly held personal account at Columbia Bank account # XXXX8160 held in the name of Jeffrey A. Siegmeister and J.L.S. According to records, Siegmeister used the proceeds to pay personal expenses, including payments on the mortgage on his primary residence in Live Oak. On March 24, 2016, Siegmeister deposited a check in the amount of $11,634.47, which was the liquidation of Coca-Cola shares, into his law firm trust account.

Defendant's Initials

Further investigation into Siegmeister's finances revealed that he filed false tax returns for tax year 2015, 2016, and 2017. For tax year 2015, Siegmeister reported Total Income (Line 22) of $150,313 on his joint Form 1040 U.S. Individual Income Tax Return, which was made under penalty of perjury. Siegmeister received a refund of $10,403 for tax year 2015. However, Siegmeister generated significant income through his scheme to defraud L.T. and his Estate. By the end of 2015, Siegmeister had diverted $240,003.50 to personal bank accounts and to purchase property.

Siegmeister knew that the only income Siegmeister reported on his joint 2015 Form 1040 U.S. Individual Income Tax Return was $150,313 in wages he earned as the State Attorney, which he knew was materially false and violated the law. The $240,003.50 in income he received in 2015 from the scheme to defraud was not reported, and through which Siegmeister intended to violate the law.

For tax year 2016, Siegmeister reported Total Income (Line 22) of -$150,128 on his joint Form 1040 U.S. Individual Income Tax Return. However, Siegmeister diverted $274,800 in proceeds from L.T. and/or his Estate in 2016, which was not reported on Siegmeister's federal income tax return.

For tax year 2017, Siegmeister failed to report the income he received in the form of a discount on a tractor provided as compensation to Siegmeister in return for providing a favorable prosecution outcome to a defendant.

For tax year 2015, Siegmeister had taxable income of $349,062 and an additional tax due and owing of $76,469. Siegmeister's total tax due and owing for tax years 2015 and 2016 was $90,874.

39

Defendant's Initials