UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                              Case No.:  3:21-cr-16-MMH-JBT

JEFFREY ALAN SIEGMEISTER,
    Defendant.

---

### JEFFREY SIEGMEISTER'S SENTENCING MEMORANDUM

The Defendant, **JEFFREY SIEGMEISTER**, by and through his undersigned attorney, submits this memorandum in aid of the sentencing hearing currently scheduled for October 17, 2022, at 9:30 a.m.  Mr. Siegmeister asks the Court to consider the following in determining the appropriate sentence herein:

### INTRODUCTION

The author, Alfred Alcorn, once wrote "The moral high ground to which I aspired had turned into a slippery slope," a turn of phrase that aptly describes the trajectory of Mr. Siegmeister's fall from grace.  Mr. Siegmeister's life will never be the same again.  He has fallen from a position of leadership and status to a person who has damaged, in some eyes irreparably, his reputation and integrity.  He has fallen from a position as the highest-level enforcer of the laws of the State of Florida in his circuit to a position as a convicted felon.  During the events for which he stands before the Court, it was difficult for Mr.

Siegmeister to see all the ways in which he was making wrong decisions and letting his worst impulses guide his actions. Now, he stands before the Court with incredible remorse and regret for the decisions that he made and the actions he took. That remorse and regret is not just himself, but even more for his elderly parents, his loving and supportive brother, and the extended family and friends who have suffered along with him in his shame and his embarrassment. Nonetheless, he will stand before this Court prepared to face the consequences. He accepted responsibility and pled guilty to Count One, Conspiracy to use a Facility of Commerce for Unlawful Activity, Count Two, Conspiracy to Interfere with Commerce by Extortion, Count Seven, Wire Fraud and Count Ten, Filing a False Tax Return of the Indictment. He faces a maximum term of incarceration of five (5) years on Count One, 20 years on Count Two, 20 years on Count Seven and 3 years on Count Ten, for a total maximum penalty of 48 years. Based on a total offense level of 25 and a criminal history category of I, his advisory guidelines range is 57 to 71 months.

This Court must impose a sentence that is "sufficient, but not greater than necessary, to comply" with the purpose of sentencing. 18 U.S.C. §3553(a). The goal of sentencing "is to lock in a sentence that is not too short and not too long, but just right to serve of purposes of §3553(a)." *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir. 2010) (*en banc*). There is no statutory requirement that a guidelines sentence be imposed. Mr. Siegmeister respectfully submits

2

that a sentence of 24 months is sufficient to satisfy the purposes of sentencing in this case, as set forth in 18 U.S.C. § 3553(a) and that a more restrictive punishment would be greater than necessary.

I. **Statutory Framework for Sentencing**

This court is required to impose a reasonable sentence in accordance with the requirements of 18 U.S.C. 3553(a). The court should consider the following factors:

1. The nature and circumstances of the case;
2. The need for the sentence imposed to:
    a. Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b. Afford adequate deterrence to criminal conduct;
    c. Protect the public from further crimes of the defendant;

    d. Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. The kinds of sentences available;
4. The advisory guideline range;
5. The need to avoid unwarranted sentencing disparities among defendants with similar records; and,
6. The need to provide restitution to any victim of the offense.

Mr. Siegmeister respectfully submits that the totality of the circumstances of the offense conduct, his substantial assistance in the investigation of his own conduct as well as that of others, and his personal history and characteristics support a downward variance from the advisory guidelines range. Mr.

3

Siegmeister requests that this Court, pursuant to the above factors, grant a variance from the guidelines and any departure warranted by the facts of this case.

## II. Offense Conduct

The procedural history of this case is laid out accurately in the pre-sentence investigation report. However, Mr. Siegmeister submits that several factors are significant to the Court's decision on sentencing:

A. Before and after his pleas of guilty, Mr. Siegmeister sat down with law enforcement and the U.S. Attorney's Office to provide assistance to their investigation no less than eight times. In total, between these meetings and his trial testimony, Mr. Siegmeister gave information, cooperated, and testified for roughly 50 hours. He answered all their questions honestly. These details are significant not only regarding his acceptance of that responsibility but also show respect towards law enforcement and remorse for his actions, in spite of the offense conduct.

B. Mr. Siegmeister committed these offenses while undergoing a period of personal and financial turmoil. His motivations are not an excuse for the crimes he committed, and he acknowledges that the responsibility for his actions is his alone. However, understanding those motivations puts his offenses within a context that helps to

4

explain, and we submit, to mitigate his actions. He married a woman who had imagined a far more lavish lifestyle than he had previously led. She wanted a life of prestige and importance. He wanted to make her happy and not suffer another failed marriage. Mr. Siegmeister and his wife were living beyond their means and the financial pressures and emotional toll of living that lifestyle caused Mr. Siegmeister to take money that was not his, something that he had never done before in his career.

C. When Mr. Siegmeister decided to run for State Attorney, he did so for two primary reasons. First, he really wanted to make a difference in his Circuit. The person he was running against, Skip Jarvis, eventually resigned due to allegations of corruption. Mr. Siegmeister had worked for 6 years as an Assistant State Attorney. He believed in the job and took his work seriously. He believed that he could run the office fairly and with integrity. Unfortunately, he found himself succumbing to pressure to grant favors to those who were connected to the movers and shakers of the Circuit. He found himself taking all the risks, facing criticism and anger from the rank-and-file prosecutors in his office and getting nothing in return but a promise of support at his next election and headaches from all the demands. Tragically, he decided to take a small piece of the

5

financial benefits for himself.  That last fateful step, from doing favors to selling favors, thankfully only happened a handful of times.  One of Mr. Siegmeister's most bitter realizations was that he destroyed his life for a few thousand dollars.  Those dollars, however, went in service to the other driving factor in his fall from grace, the unrelenting pressure from his then wife for a position of importance and stature.  She was the second reason he decided to run for State Attorney.  He left a thriving law practice to enter public service once again.  Unfortunately, his public salary meant that he was now struggling to pay the bills for cars, luxury goods and private clubs.  Part of Mr. Siegmeister's remorse is that he didn't have the fortitude to end the marriage before the marriage ended him.

D. As to the offense conduct surrounding the Wire Fraud convictions, Mr. Siegmeister acknowledges that he diverted money from Mr. Thomas' estate, in essence, stealing money from his mother.  Despite this wrongful behavior, Mr. Siegmeister has always maintained that he had a personal, as well as a professional relationship with Mr. Thomas.  He relates that Mr. Thomas saw something of himself in Mr. Siegmeister.  Mr. Thomas had been an attorney who had himself been disbarred due to issues surrounding his alcoholism.

6

Mr. Siegmeister met Mr. Thomas shortly after he'd suffered an accident. At that time, he was appointed as guardian of Mr. Thomas' person. He made sure he got appropriate medical care, had him placed in assisted living facilities, instead of the rundown motel he'd been staying in, and visited with him often. In 2010, he became voluntary guardian of Mr. Thomas's property. Before Mr. Thomas made a will, he made sure that he was competent by having him evaluated. Later, upon discovering the Coca-Cola shares, he opened an account and put the shares "on record." Because of Mr. Siegmeister, there was now a public record of the shares that Mr. Thomas owned, something that had not previously existed. Nonetheless, upon Mr. Thomas' death, Mr. Siegmeister succumbed to the temptation to divert significant amounts of money from the beneficiary to himself.

### III. Background and Characteristics

Mr. Siegmeister's history and characteristics are also significant factors that support a downward variance in this case. Attached are letters that invariably describe Jeffrey Siegmeister as a loving and caring son, brother, friend, and employer. He is described in letter after letter as someone who cares about and gives back to his community through volunteer work and involvement in local organizations.

7

Jeffrey Siegmeister was born in Hialeah, Florida. His parents divorced when he was a year old. His father was a bully who was harsh, cold, and emotionally abusive to both his children and their mother. Because of his behavior, Jeff and his father were estranged since he was a child. After his arrest, with his older brother Joe's encouragement, he has reached out and re-initiated contact. The family moved north to the Gainesville area when Jeff was 3, where his mother Nancy Bowen married Jeff's stepfather, William Bowen, a patrol lieutenant for the Alachua County Sheriff's Office. His home life was chaotic but loving. He lived a good bit of time with his grandparents, so he and his brother moved a lot as they were growing up. While they always had food and a roof over their heads, the family did not have a lot of money and he was often embarrassed about being poor. Jeffrey has a strong relationship with both his mother and stepfather. William Bowen has been his father since he was three years old, and they have a very close bond. In fact, one of Mr. Siegmeister's main concerns throughout this case has been the effect on his elderly parents.

Jeff did well in school, even though he went back and forth between his parents and grandparents, and between Alachua and Union County schools several times. When he was 7, Alachua Schools placed him in the gifted program after his IQ tested at 130-137 on two different tests. He graduated as class valedictorian from Union County High School in Lake Butler in

8

1986.[1]  After graduation, he earned scholarships to the University of Florida. He earned a Bachelor of Science degree in microbiology and cell science.  He had originally been contemplating medical school but decided instead to follow his passion and go to law school.   Because he was contemplating a career in the FBI, he applied to and was accepted into the University of Florida's Law School and graduated in 1993.  From there, he began a career as an assistant state attorney in the Third Judicial Circuit.  He worked there from 1993 to 2003.  For several years, he was assigned to a special unit that prosecuted major crimes involving homicides and abusive crimes against women and children.

It was while at the State Attorney's Office that Jeff experience his first bout with anxiety.  This manifested itself through sleeplessness, weight loss and shortness of breath.  He was prescribed medications to help him deal with these issues.[2]  His brother, Joe attributed his anxiety to dealing with murder and child sex cases, but these issues would follow him for many years to come.  After leaving the State Attorney's Office, he worked at the Columbia County Sheriff's Office as in house counsel. With the election of a new sheriff two years later, he left to begin his own practice.

---

[1] A redacted School Record, a cumulative record of his school history, is attached as an exhibit.  Full school records are available upon request.
[2] See Pretrial Services Report, Page 3.

9

By all accounts, Mr. Siegmeister's private practice was successful and well-regarded. He was described by numerous letter writers as a great boss who take care of his employees, a caring attorney who sometimes would sacrifice money or time to help out a poor client or an employee down on their luck.[3]

Mr. Seigmeister had previously been married to Judy Moore, but they had divorced in 2003. In 2006, he married his second wife, Jamie Dykes. They began building a life together as he built his law practice. With her repeated encouragement and pushing, Mr. Siegmeister eventually decided to run for State Attorney for the Third Judicial Circuit. After being elected in 2012, he closed his lucrative law practice. Mr. Siegmeister served as the elected State Attorney from 2013, through his re-election in 2016 and served until his resignation in December of 2019. It is worth noting that the offense conduct involving his position as State Attorney does not begin until July 2017 and its entirety is a handful of transactions over an 18-month period.

Mr. Siegmeister submits that his unblemished early history throughout his early adulthood, his record of service to his community, and the relatively short period over which the offense conduct took place are all factors that mitigate towards a downward variance from the advisory guidelines.

---

[3] See attached Letters.

10

Mr. Siegmeister's medical issues are also a factor that should be given some weight in considering an appropriate sentence. He began experiencing severe pain and muscle spasms in 2009. They began in his hand and shoulder but eventually developed into back pain, numbness in his fingers and severe migraine headaches. A cervical MRI in 2010 showed significant disc issues. Pertinent redacted records from the Orthopedic Institute in Lake City are attached as exhibits.[4] Mr. Siegmeister's neck pain and migraines resulting from a diagnosis of cervical disc disease have continued to the present. Additionally, the medical staff at the Nassau County Jail diagnosed him with diabetes, hypertension, hyperlipidemia, as well as asthma and adjustment disorder with anxiety, during his lengthy stay at that facility.[5] The jail put him back on Vistaril for anxiety in November. Further incarceration will adversely affect his physical and emotional health. Mr. Siegmeister has already served 20 months in custody for his actions. During that time, he was infected with Covid twice with unknown long-term effects on his health. He has missed holidays and birthdays. He hasn't seen his family since his arrest because he did not want to subject them to the experience of coming to a jail and seeing him in a behind bars in a jail jumpsuit. Any further time

---

[4] See attached medical records. A full set of records is available upon request.
[5] A redacted summary of those records, including his current medications, are included in the medical records exhibit.

11

will be a sentence that is greater than necessary to achieve the purposes of sentencing.

## IV.   Sentencing Options and Guideline Range Calculation

As the guidelines currently stand, Mr. Seigmeister is currently facing an advisory guidelines sentence of 57 to 71 months. It has been suggested that the Government will be filing a 5K motion based on Mr. Seigmeister's substantial assistance recommending a 4-level reduction in Mr. Siegmeister's offense level. If that is correct, and if the Court grants such a motion, then upon the Government's recommendation, Mr. Siegmeister's offense level would become 21 and his guidelines would be 37 to 46 months. The Defense would certainly agree that Mr. Siegmeister's extensive cooperation should be recognized by the Court in determining an appropriate sentence. It appears that Ernie Page also received a 4-level reduction of his guidelines. That cooperation appeared to consist primarily of Mr. Page making full statements to law enforcement over the course of one meeting and then pleading guilty. Mr. Siegmeister's was much more extensive. Given the number of times that Mr. Siegmeister sat down with agents and prosecutors, given the number of hours that he spent fully outlining and explaining everything that went on between himself and Mr. O'Steen and that testified as a witness against Mr. O'Steen for a day and a half, Defense counsel respectfully submits that a

12

further reduction in the offense level is warranted. These facts support a downward variance in the advisory guidelines.

## V. Conclusion

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence and incapacitation. In this case, based on Mr. Siegmeister's prior history and the lengthy period for reflection that he has had during the pendency of this case, there appears to be no need for incapacitation or specific deterrence. Mr. Siegmeister's likelihood of recidivism is very low. Based on his prior personal history and the numerous letters submitted on his behalf, there is no indication of any ongoing threat to any segment of the community. This is based primarily on his lack of a criminal history prior to these offenses and a consideration of the particular factors that combined to motivate him to commit these offenses. But it is also based on him already having come face to face with the consequences of his actions. The career that he loved so much and dedicated so much passion to is now gone forever. So many of the letters written by his friends and former employees talk about his dedication to his and cases, his desire to help others even without payment. That is forever over. The only thing he can do now is to try to build another life to support himself that does not utilize the education that he worked so hard to complete. After his plea of guilty in this case, he voluntarily surrendered his law license, a further reflection of his acceptance of

13

responsibility for his actions. He is now a convicted felon. He will carry that for the rest of his life.

Another consequence that he's already had to face is in the loss of nearly everything that was once so important to him. He has lost his reputation professionally and personally. He can rebuild the personal relationships and try to regain his reputation for integrity in those relationships, but he will not be given the opportunity to do that professionally. He has lost everything financially and is essentially bankrupt. He will come out of any prison sentence with nothing. He will start from scratch. Additionally, he has dealt with the diminution of his family's esteem. While they will always love and support him, their pain, disappointment, and embarrassment are heavy weights that he will carry for the rest of his life.

Finally, the time he has already spent behind bars have left a lasting impact on Mr. Siegmeister. The time away from his family, the loss of birthdays and holidays with his elderly parents. These have had a profound effect on him. He needs no further incentive to never commit another criminal act than the memory of these very long 20 months that he has already served. The federal sentencing structure instructs the Court to individually tailor a sentence to the defendant that is standing before it. What type of sentence is necessary to protect the public, provide adequate deterrence against future offenses and to punish appropriately for the offense conduct at issue? How

much more is necessary for a man who has done everything he can to accept his own responsibility for his actions, who has done everything he can to make amends and make things right with his cooperation and to show remorse for what he has done? We submit that the concerns of sentencing will be well met by a sentence that is time served with supervised release to follow.

Mr. Siegmeister recognizes that he can do more to rehabilitate himself. This is based on the fact that Mr. Siegmeister's substance abuse and mental health issues no doubt were contributory factors in his conduct. To that end, we submit that conditions requiring substance abuse treatment and mental health counseling would be appropriate conditions that would address the rehabilitative purpose of sentencing.

Based on all the factors elucidated above, Mr. Siegmeister submits that a sentence of 20 months, followed by 5 years of supervised release that includes conditions requiring substance abuse treatment, mental health treatment, community service and restitution, is a reasonable sentence, given all the facts and circumstances, that is "sufficient but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a). Given all the facts and circumstances of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

        **A. FITZGERALD HALL, ESQ.**
        **FEDERAL DEFENDER**

Respectfully Submitted By:

*/s/ Waffa J. Hanania, Esq.*
Waffa J. Hanania, Esq.
Assistant Federal Defender
Florida Bar No. 0888631
200 West Forsyth Street, Suite 1240
Jacksonville, Florida 32202
Telephone: (904) 232-3039
Fax: (904) 232-1937
Email: waffa_hanania@fd.org

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 12th day of October 2022 a true copy of the foregoing was served by electronic notification to Kelly Karase, Office of the United States Attorney and Irish Anderson, United States Probation Office.

*/s/Waffa J. Hanania, Esq.*
Waffa Hanania, Esq.